IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BRYAN ANGLE, II,

    v.

LT. SMITH; LT. FROELICK; C/O GUYTON; SGT. MALUK; C/O BONCELLA; C/O HARRISON; C/O BRIDGES; C/O McDANIELS; C/O MONTINI; C/O NADAL; C/O ARCLEY; C/O HAM; C/O VANDERHOOF; C/O BLY; C/O SMITH; and, HEX SZEWESKI; UNKNOWN JOHN & JANE DOES

    Defendants.

No. 22-cv-0033

CIVIL ACTION

**FILED**

JUL 28 2022

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## PLAINTIFF'S AMENDED COMPLAINT

AND NOW comes Plaintiff Bryan Angle, pursuant to the Court's July 1, 2022 Memorandum Order, with Plaintiff's Amended Complaint, and states as follows:

### I. JURISDICTION AND VENUE

1. This is a civil action authorized by 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the Constitution of the United States.

2. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) & (4), and 1367. and state tort law/suplimental jurisdiction

3. Plaintiff seeks declaratory relief pursuant to 28 U.S.C. § 2201, 2202.

1.

4. Plaintiff's claims for injunctive relief are authorized by 28 U.S.C. §§ 2283, 2284 and Federal Rule of Civil Procedure 65.

5. The Western District of Pennsylvania is an appropriate venue under 28 U.S.C. § 1391(b)(2) because the State Correctional Institution ("SCI") at Albion ████████████████████ is where the events giving rise to these claims occurred.

## II. PARTIES

6. Plaintiff Bryan Angle was at all times relevant to this Amended Complaint a prisoner detained by the Pennsylvania Department of Corrections ("DOC") at SCI-Albion. Plaintiff has since been transferred to SCI-Fayette, in Labelle, Pa.

7. Defendants Lt. Smith, Lt. Froelick, C/O Guyton, Sgt. Maluk, C/O Boncella, C/O Harrison, C/O Bridges, C/O McDaniels, C/O Montini C/O Nadal, C/O Arcley, and C/O Ham are all the DOC officials who either personally participated in the brutal beating that Plaintiff was the victim of (on May 15, 2021), failed to intervene and protect Plaintiff from the excessive force, or, ultimately, conspired with those who attacked Plaintiff, by failing and/or to intervene by and through their failure to report that to which they knew regarding the excessive force that Plaintiff was the victim off.

8. Defendants (C/O's) Vanderhoof, Bly, and Smith were at all times relevant to this Amended Complaint the DOC officials who, subsequent to the May 15, 2021 excessive force incident, collectively, were involved in the retalitory destruction, confiscation, and con-

2.

version of Plaintiff's religious and/or personal property  (on ~~~~ May 21, 2021).

9. Defendant Szeweski was at all times relevaNT TO THIS Amended Complaint the Hearing Examiner ("HEX") at SCI-Albion, responsible for overseeing, and, ultimately, pursuant to the DOC's DC-ADM 801 policy and procedure manual, entering a ruling as to any and all misconducts issued within SCI-Albion; specifically, relevant to this suit, Plaintiff's misconducts, unjustifiably issued for the false allegations of excess property and/or the May 15, 2022 excessive force incident.

10. Each of the above-named Defendants are sued individually and in his or her "official" capacity for injunctive relief, only; and, in his or her private/personal capacity at all times mentioned in this Amended Complaint while porpurting to be acting under color of state law.

## III. FACTS

11. On May 15, 2022, sometime in between 2-3 p.m., Plaintiff's block, B/A, at SCI-Albion, was out for "dayroom".
12. "Dayroom" refers to the timeframes in which inmates on a particular housing unit, typically in the jails "general population", are allowed to congrate in the day room area of their housing area and play games, sync their tablets, etc.
13. At some point, Plaintiff began to smoke an electronic cigarette ("E-cig"). An unknown C/O noticed plaintiff smoking the E-cig and instructed him to "take it in," i.e., go to his cell.
14. Initially, Plaintiff objected, telling the C/O: "if you want

3.

to punish me- put it in a misconduct!"

15. After several threats from this unknown C/O that; if Plaintiff did not "take it in", he (the C/O) was going to make the entire pod "take it in", with a few suggestive comments from his peers as motivation, Plaintiff eventually went to his prison cell, B/A 64.

16. Upon arriving at his cell, being that the cell door was opened, Plaintiff stepped immediately into his cell and placed his tablet on the table in his cell. Importantly, Plaintiff went to his cell without incident or any need to be forced to go.

17. Just as Plaintiff was about to close the door to his prison cell, an unknown "Sergeant" came to his cell door, asked to speak to Plaintiff, instructing Plaintiff to step onto the tier.

18. Plaintiff stepped onto the tier, standing directly to the side of his cell door, and began to provide this unknown Sgt. with his take on what had happened between himself and the unknown C/O who'd told him to "take it in".,

19. While Plaintiff was talking to the Sgt., he noted that there was several unknown DOC officials pouring onto his pod, many of whom were draped in fleeces and mask; the kind that were frequently worn by people during the COVID-19 pandemic. These Fleeces covered their name tags Making it impossable to identify them

20. As Plaintiff was going about explaining his side to the Sgt., several of these masked officials made it to the top tier where he and the Sgt. were conversating and began to crowd around Plaintiff and the Sgt. One of these masked officials was brandishing a can of O.C. pepper spray.

21. It was at this moment that it became clear to Plaintiff that the

unknown C/O who he'd originally had the disagreement with must have called for back up, or something to that effect; as, that was the only explanation for this sudden arrival of DOC officials, possibly outnumbering the number of inmates in the dayroom at the time!

22. Plaintiff, pausing a second from his testimony to the unknown Sgt., apprehensive about the manner in which the C/O brandishing the can of O.C. pepper spray was shaking the can, told the the crowd gathering around him, no one in particular, though: "I'm allergic to pepper spray."

23. It was around this time that one of the masked DOC officials closed Plaintiff's cell door, and he was instructed to turn around and cuff up. At that point Plaintiff informed the crowd that he had LITERALLY just been in his cell, where he'd been told to go - prior to being instructed by the unknown Sgt. to step back onto the tier and give his account of what had happened!

24. Before Plaintiff could even turn around, almost simultaneously to one of the masked officials predicting: "this isn't gonna end well for you"; Plaintiff was roughly apprehended by one of the officials who proceeded to take him to the ground.

25. In spite of Plaintiff not only having went into his cell as he'd been instructed, calmly Speaking with the Sgt. ; who at least appeared willing to sincerely hear Plaintiff's account, prior to the arrival of this angry mobb of frustrated DOC officials; Plaintiff now found himself at the bottom of a pile of DOC officials- crying and screaming for air!

26. "Help! Help! I can't breathE!" Plaintiff called out, to anybody who would listen; admist calls from his peers for the C/O's to "stop!"; "your gonna kill him!"; "can't you hear him?- he said he can't breathe". All this while an unknown cameraman John Doe repeatedly informed the DOC officials engaged in the assualt that "your on camera! Ya'll are on camera!" But still failed to intervene

27. After what seemed like an eternity, Plaintiff was pulled to his feet - bearly able to stand without the aide of an unknown and unindentified helping hand.

28. As Plaintiff slowly came to, light headed and dizzy from the beating he'd sustained; much of which occurred twenty, thirty seconds AFTER he'd been handcuffed (from behind); he stated, to no one in particular; more so to the camera he believed was still rolling; "I'm going to sue EVERYONE of y'all for this shit!":

29. It was at that point that a C/O-who he would later came to know as "C/O Guyton"-turned around and punished Plaintiff square in the face! When C/O Guyton's fist contacted Plaintiff's face, Plaintiff thought his head had EXPLODED!

30. When Plaintiff Almost went to his knees from C/O Guyton's unanticipated blow, it was at this point that another one of the unknown- and, unidentified, at the time - Defendants began to drag Plaintiff by his hair off of B/A - with others continuing to kick, punch, slap and unnecessarily abuse and taunt Plaintiff - all while he was handcuffed behind his back!

31. At no point did Plaintiff resist. In fact, Plaintiff was being so viciously assualted that one of the DOC officials amongst

the angry mobb, Sgt. Harris, himself no longer able to stomach what ~~he~~ she was witnessing, called out for the others to :"Stop! Stop it! Ya'll are gonna kill him!"

32. Plaintiff informed Sgt. Harris of his obligation to report what ~~~~ she was seeing. It was at this time that Plaintiff heard Defendants Guyton, Boncella, and McDaniels joking that: "That's not what my misconducts gonna say!"; "Mine, either!"

33. Plaintiff was escorted to the units "sally port" by his hair. By Defendant John Doe

34. Upon arriving at the sally port, Plaintiff was placed against the wall and pat searched. It was at this time, as the pat search was being conducted, that Defendant (Lt.) Smith ordered a C/O to take Plaintiff's Kufi (a religious head piece; for Muslims% For his sincerly held Religious belief

35. Plaintiff was subsequently taken to the Restricted Housing Unit ("RHU"), where, upon entering the RHU, he asked of Defendants Maluk and Froelick to please get his Kufi from Defendant Smith. They refused.

36. Defendants proceeded to process Plaintiff into the RHU. He was asked "are you suicidal". Plaintiff answered "yes," and was taken immediately to the Psychaitric Observation Cell ("POC") in the infirmary area.

37. After arriving at the POC, once the camera was turned off, Plaintiff asked Defendant Frolick if he could get his Kufi back?; to which Defendant Froelick responded: "If I get your Kufi, I'm'a wipe my ass with it, you faggot Muslim. You shouldn't be Muslim, anyway. Your white!"

38. Plaintiff was cleared to leave the POC on May 17, 2021. Upon

7.

his discharge from the POC, Plaintiff was sent to the RHU.

39. Shortly after returning to the RHU, from the POC, Plaintiff was informed by a one Defendant Luckcock that he doesn't eat or get anything else until he performed oral sex on Defendant Luckcock. More precisely, until Plaintiff "sucked his penis."

40. It did not take long after Plaintiff was discharged from the POC, and sent back to the RHU for a campaign of harassment to start that left Plaintiff again contemplating suicide!

41. One of these incidents happened on May 21, 2021.

42. Plaintiff was being housed in cell H/D 11, in SCI-Albion's RHU. Defendants Bly and Smith came to Plaintiff's cell and took him to the RHU property room where Defendant Vanderhoof was waiting for Plaintiff.

43. Plaintiff informed Defendants Bly, Smith, and Vanderhoof of his need to specifically be provided with his legal work so that be could pursue grieving the excessive force that he was subjected to on May 15, 2021.

44. Based upon this request, Defendant Vanderhoof went about the inventorying of Plaintiff's property, confiscating a substantial amount of Plaintiff's personal property under the guise that it was in excess, altered, or simply failing to write upon the proper inventory sheet some of Plaintiff's other property.

45. Specifically, outside of refusing to give Plantiff any of his legal property, Defendants Vanderhoof, Bly, and Smith confiscated Plaintiff's antenna amp, 3 pairs of headphones, and a GPX wristband radio; falsely alleging that Plaintiff's headphones and GPX wristband radio were altered.

8.

46. Of the items that Defendants Bly, Smith, and Vanderhoof excluded from the falsified Property sheet <u>altogether</u> were Plaintiff's :15 E-cig's, 5 cans of ZYN, and a Universal remote.

47. Upon Plaintiff's informing Defendants Bly, Smith, and Vanderhoof of the fact that their failure to document his property on the property inventory sheet would compel Plaintiff to have to file a grievence aginst them, collectively, Defendant Vanderhoof pointed to all of Plaintiff's legal property that he'd separated from that which he hadn't destroyed or confiscated and said: "I can see that you like to file lawsuits and grievances. Don't worry about that, though. This misconduct you'll be getting for all this excess property will off set all that!"

48. Just as Defendant Vanderhoof had told Plaintiff on May 21, 2021, Plaintiff was in fact given an misconduct, alleging that he had property in excess of what he was suppose to have.

49. The first time that Plaintiff became aware of the exact identity of all the DOC officials who ▓▓▓ were involved with the excessive force that was carried out against him on May 15, 2021 is when he was served with the three (3) misconducts that Defendants Guyton, McDaniels, and Boncella issued him; all falsely alleging that it was Plaintiff who attacked them. When it was in fact them - ▓▓▓▓▓ along with Defendants Smith, Froelick, Maluk, Harrison, Bridges, McDaniels, Montini, Nadal, Arcley, and Ham, collectively - who either directly participated in the excessive force, failed to intervene and/or protect Plaintiff from it, report or document it, or used

9.

their involvement in the investigative process to conceal and protect the identities of their fellow co-workers who carried out the excessive force.

50. Specifically, none of the Defendants (ALL named in paragraph 49) documented within the body of the DC-121 "Use of Force" forms how Plaintiff was punched, kicked, or choked on May 15, 2021 - nor how they themselves may've in fact also partaken in the actual excessive force!

51. HEX Szeweski conducted a hearing on the alleged excessive property misconduct that Plaintiff was given by Defendants Bly, Smith, and Vanderhoof on May 21, 2021.

52. Defendant Szeweski reached the conclusion that Plaintiff, contrary to the allegations of Defendants Bly, Smith, and Vanderhoof, DID have an art permit. In reaching this conclusion, Defendant Szeweski ordered that Plaiuntiff's confiscated art materials be returned;

53. Defendant Szeweski then found Plaintiff guilty of contraband.

54. ~~[redacted]~~ Plaintiff asked if Defendant could pull his property to prove that Plaintiff in fact Did NOT have in excess of four (4) boxes, and that items were not altered and to review the camera footage. Defendant Szeweski denied this request.

55. Defendant Szeweski retaliated against Plaintiff by saying "that's what you get when you assualt my officers," and ~~[redacted]~~ found Plaintiff guilty and took his property. This was done Not in a "legal" Retaliation but still in violation of ~~[redacted]~~ Supreme court Ruling Woolfer McDonell and state tort law

10.

## IV. LEGAL CLAIMS

56. Plaintiff realleges and herein incorporates by reference any and all facts as set forth in paragraphs 1-55. Accordingly, all well-pleaded, material allegations of facts, taken as true and construed in the light most favorable to Plaintiff, are sufficient to state claim(s) to relief under the:

### FIRST AMENDMENT OF THE U.S. CONSTITUTION

57. "Retaliation" against Defendants: Guyton, Boncella, and McDaniels (falsified misconducts and physical assualt for Plaintiff voicing his intent to sue for excessive force); Vanderhoof (intent to file grievances, objections to the falsification of DC-153 "personal property" form, etc.); and Defendant (Lt.) Smith (confiscation of "Kufi", religious head piece; for Plaintiff's "faggot Muslim" practices while being "white.");

* These same facts, pursuant to 28 U.S.C § 1367, set forth state tort claim(s) of "destruction of property" (against Defendants (Lt.) Smith and Vanderhoof); "conspiracy"[1] (against Defendants Vanderhoof, Bly and Smith; and, Guyton Boncella, and McDaniels)

### EIGHTH AMENDMENT OF THE U.S. CONSTITUTION

58. Against Defendants: (Lt.) Smith, Froelick, Maluk, Harrison, Bridges, McDaniels, Montini, Nadal, Arcley, and Ham ("cruel

---

1. Plaintiff's "Conpiracy" claim is also brought pursuant to 42 USC § 1983.

11.

and unusual punishment", i.e., excessive force) and/or "deliberate indifference", i.e., failure to protect/intervene and/or report);

* These same facts, pursuant to 28 U.S.C. § 1367, set forth state tort claims of "assualt", "battery", "falsification of documents", and "conspiracy"[2] against ALL of these Defendants.

## FOURTEENTH AMENDMENT OF U.S. CONSTITUTION

58. "Class-of-one" "Equal Protection" against Defendant (Lt.) Smith (i.e., religious discrimination; on account of Plaintiff being a "white" practitioner of the Muslim faith, and taking Plaintiff's "Kufi", i.e., religious head piece, because of his hatred not only toward Muslim's, but, Plaintiff, who is "white while being Muslim).

## DESTRUCTION AND/OR MISAPPROPRIATION OF PROPERTY

59. Against Defendant Szeweski (in connection with his sanction during the misconduct hearing as to Plaintiff's personal property). and LT. Smith, CO Vanderhoof, CO smith, CO Bly, and CT. Fridelich for the illegal confiscation of his Kufi and other property

## V. PRAYER FOR RELIEF

WHEREFORE, the foregoing reasons, Plaintiff sincerely prays

---

2. Again, Plaintiff's "Conspiracy" claims are also brought pursua to 42 U.S.C. § 1983, as well.

12.

that this Honorable Court shall enter judgment:

## DECLARATORY

60. Grant Plaintiff declaratory relief declaring that the acts and omissions of the herein named Defendants violate the Constitution of the United States of America.

## INJUNCTIVE

61. Granting Plaintiff injunctive relief compelling the herein named Defendants to either return Plaintiff's :1) Universal remote 2) GPX wristband raadio, and 3) his Kufi; or, alternatively, replace said items with their likeness or a better version, or provide Plaintiff with the financial equalivant of these items.

## COMPENSATORY

62. Granting Plaintiff compensatory damage in the amount of $25,000 for the retaliatory taking of his personal property, and or the confiscation of these items, and the inability to enjoy the benefits of these items that Defendants retaliatory conduct has forced upon Plaintiff.

## PUNITIVE

63. Granting Plaintiff punitive damage in the amount of $1,000,000 against ALL Defendants for their collective violations of Plaintiff's rights under the United States Constitution;

64. Granting Plaintiff punitive damage in the amount of $7,500 for EACH state tort claim against EACH named Defendant.

MISCELLANEOUS

65. GRANTING Plaintiff a trial by jury on all claims triable by a jury;

66. GRANTING Plaintiff recovery/reimbursement of any and all costs reasonably associated with the prosecuting of this civil action;

67. GRANTING Plaintiff any additional relief either judge or jury deems to be just, equitable, or proper.

## VERIFICATION

In accordance with 28 U.S.C. § 1746: "I declare under penalt of perjury that the statements made in this Amended Complaint are true and correct to the best of my knowledge and belief. Executed this 14th day of July, 2022."

Respectfully submitted,

D/ July 14, 2022

S/ [signature]

Bryan Angle, II-HY2333

48 Overlook Drive

Labelle, Pa 15450